IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LEROME BRANTLEY, #224918, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:18-CV-471-MHT |
| | ) | (WO) |
| | ) | |
| OFFICER J. WHITTEN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is pending before the court on an amended complaint filed by Lerome Brantley, a state inmate currently incarcerated at the Staton Correctional Facility, in which he challenges actions taken against him on February 18, 2018 at the Draper Correctional Facility.  Doc. 18.  Specifically, Brantley alleges correctional officers subjected him to the use of excessive force, failed to protect him from the use of such force and improperly delayed his receipt of medical treatment for injuries suffered during the challenged use of force.  Doc. 18 at 2–4.

On June 24, 2020, Brantley filed a motion for preliminary injunction wherein he alleges a continuing denial of adequate medical treatment for injuries suffered during the use of force challenged in this case, including the failure to provide medication ordered by an off-site neurologist, and that the denial of such treatment is in retaliation for proceeding in this civil action.  Doc. 119 at 3–4.  Brantley also alleges the defendants have undertaken

other retaliatory acts against him such as protesting his release on parole for litigating this case.  Doc. 119 at 4.

The court entered orders directing the defendants to file a response to the motion for preliminary injunction and supplemental responses showing why this motion should not be granted, and they have done so.  In accordance with the directives of these orders, the defendants submitted declarations from Dr. Michael Borowicz, the Medical Director at Staton, Doc. 126-1 at 1–9, Doc. 141-1 at 1–3 & Doc. 145-1 at 1–2, and relevant medical records, Doc. 126-1 at 10–31 & Doc. 145-2 at 1–7, and an affidavit from Joseph Headley, a warden at Staton.  Doc. 129-1 at 1–2.

Upon consideration of the motion for preliminary injunction, the responses thereto filed by the defendants and replies to the responses filed by the plaintiff, the undersigned finds that the motion for preliminary injunction is due to be denied.

## II.  DISCUSSION

### A.  Requisite Elements for Issuance of a Preliminary Injunction

"The grant or denial of a preliminary injunction rests within the sound discretion of the district court."  *Transcon. Gas Pipe Line Co. v. 6.04 Acres, More or Less*, 910 F.3d 1130, 1163 (11th Cir. 2018); *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (same).  This court may grant a preliminary injunction only if the plaintiff demonstrates each of the following requisite elements: (1) a substantial likelihood of success on the merits; (2) an irreparable injury will occur absent issuance of the injunction; (3) the injunction will not substantially harm the non-moving parties; and (4) if issued, the

injunction will not be adverse to the public interest. *Long v. Sec'y Dept. of Corrections*, 924 F.3d 1171, 1176 (11th Cir. 2019); *Palmer*, 287 F.3d at 1329; *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352 (11th Cir. 1983).  "In this Circuit, [a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion as to the four requisites." *McDonald's*, 147 F.3d at 1306 (internal quotations omitted); *Wreal LLC v. Amazon.com, Inc .*, 840 F.3d 1244, 1247 (11th Cir. 2016) (internal quotations and citation omitted) ("A preliminary injunction is an extraordinary and drastic remedy, and [Plaintiff] bears the burden of persuasion to clearly establish all four of these prerequisites."); *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (a preliminary injunction is issued only when "drastic relief" is necessary); *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and movant must clearly carry the burden of persuasion on each of the requisite elements).

## B.  Defendants' Responses to the Motion for Preliminary Injunction

The defendants filed declarations from Dr. Michael Borowicz, Doc. 126-1 at 1–9, Doc. 141-1 at 1–3 & Doc. 145-1 at 1–2, and Brantley's relevant medical records, Doc. 126-1 at 10–31 & Doc. 145-2 at 1–7, in response to the motion for preliminary injunction with respect to his allegation of a denial of medical treatment.  In his declarations, Dr. Borowicz explains the medical treatment provided to Brantley for his complaints regarding injuries

suffered in the incident with officers in February of 2018.  The defendants likewise deny that that they took any retaliatory action against Brantley regarding either the medical treatment he received or his parole.  Doc. 129 & Doc. 129-1 at 1–2.

After a thorough review of the medical records filed in response to the motion for preliminary injunction, the court finds that the details of medical treatment provided to Brantley as set forth by Dr. Borowicz in his declarations are corroborated by the objective medical records contemporaneously compiled during the treatment process.  In his initial declaration, Dr. Borowicz addresses the allegations of deliberate indifference, in relevant part, as follows:

> I am aware that Mr. Brantley alleges that he is being denied necessary medical treatment for the injuries that he allegedly suffered during a use of force incident involving the Alabama Department of Corrections and that he is being denied a referral to an off-site neurologist.
>
> Attached hereto are the inmate body chart documentation forms completed on February 18, 2018, subsequent to Mr. Brantley's altercation with correctional officers.
>
> Mr. Brantley alleged that he was handcuffed and choked from behind due to the fact that he had a phone on his person.
>
> Prior to the incident in question, Mr. Brantley had previously complained of pain in his cervical spine.
>
> Attached hereto are relevant and pertinent medical records with regard to complaints of pain alleged by Mr. Brantley during his incarceration with the Alabama Department of Corrections.
>
> In September 2008, Mr. Brantley complained of pain down his right shoulder. Therefore, a cervical spine x-ray was ordered. That x-ray was read by the radiologist as follows:

Findings:  Two views of the cervical spine demonstrate the spine to be in excellent anatomic alignment with a normal lordotic curvature.  All vertebral bodies demonstrate normal density and heights. All intervertebral disc spaces are normal. The posterior elements are intact. There is no rotation or scoliosis. There is no spondylolysis or spondylolisthesis. The pre-vertebral soft tissues and air column are unremarkable. Impression: Normal cervical spine.

Subsequent to the incident in February 2018, Mr. Brantley complained of pain in his back. Therefore, beginning in July of 2018, x-rays and MRIs were taken to determine the nature of the pain being alleged by Mr. Brantley.

X-rays were taken of Mr. Brantley's cervical spine and left and right shoulder on July 19, 2018.  Those x-rays were read by the radiologist as follows:

Exam: Radiograph of the cervical spine.
Technique: AP and lateral views of the cervical spine are submitted. Multiple studies same day.
Prior studies: No prior studies are submitted.
Findings: Multiple views of the cervical spine demonstrate normal cervical lordosis. The intervertebral disc spaces are well preserved. There is no evidence of spondylolisthesis or acute bony injury. The facet joints appear normal. The paravertebral soft tissues are unremarkable.
Impression: Normal cervical spine. Recommendation: Follow up as clinically indicated.
                                        ***
Exam: Radiograph of the left shoulder.
Technique: AP internal and external rotation views of the left shoulder are submitted. Multiple studies same day.
Prior studies: No prior studies are submitted.
Findings: Multiple views of the left shoulder demonstrate no fracture, dislocation or subluxation. The glenohumeral joint and the acromioclavicular joint  articulate normally. All cortical margins are intact, and the soft tissue planes are normal.
Impression: Normal left shoulder.
Recommendation: Follow up as clinically indicated.
                                        ***

Exam: Radiograph of the right shoulder
Technique: AP internal and external rotation views of the right
shoulder are submitted.  Multiple studies same day.
Prior studies: No prior studies are submitted.
Findings: Multiple views of the right shoulder demonstrate no
fracture, dislocation or subluxation. The glenohumeral joint
and the acromioclavicular joint articulate normally. All cortical
margins are intact, and the soft tissue planes are normal.
Impression: Normal right shoulder
Recommendation: Follow up as clinically indicated

Due to Mr. Brantley's continued complaints of pain in his back, MRIs
were taken of Mr. Brantley's lumbar and cervical spine on January 8, 2019.
The results of the MRI[s] were read by the radiologist as follows:

History: Pain unspecified
MRI Lumbar Spine WO CONT (Atmore)
History: Bilateral lower extremity numbness. Low back pain.
Altercation one year ago. No previous.
Findings: Incomplete adipose replacement of the marrow
spaces noted consistent with age. The spinal cord ends in
normal position  behind T12-L l. No definite marrow  space
edema is seen. No compression fracture is identified.  No
evidence of subluxation. The disc spaces are well preserved.
On axial imaging, there is a normal appearing disc space at L-
2.
At L-3, there is a normal appearing disc space.
At L3-4, there is a normal appearing disc space.
At L4-5, there is a minimal disc bulge. No significant spinal or
neural foraminal stenosis.
At L5-S1, there is a minimal disc bulge but no significant
spinal or neural foraminal stenosis.
Posterior to the left facet joint  at L5-S 1 are two small synovial
cysts seen.
Impression:
Minimal disc bulge is suspected at L4-5 and L5-S1. Small
synovial cyst posterior to L4-5 on the left. No focal soft tissue
disc herniation or compression fracture identified.
                              ***
History:  Pain unspecified.
MRI cervical spine WO CONT (Atmore)
Cervical spine MRI.

No priors for comparison.

Findings: Partly visualized posterior fossa grossly unremarkable and anatomy v. cervicomedullary junction within normal limits without cerebellar tomsilar ectopia. Some cord parenchymal artifact suggested without definite lesion or syrinx.   Cervical spine alignment anatomic. No diffuse Tl marrow replacement process.

C2-3: Unremarkable disc with patent central canal and neural foramen.

C3-4: Discogenic degenerative changes with posterior disc osteophyte complex slightly eccentric to the right.   Ventral CSP effaced without cord contact. AP dimensions of the central canal 1 mm. Left neural foramen perhaps very slightly encroached without definite neuroforaminal stenosis.

C4-5: Perhaps minimal disc bulge with central canal and neural foramen patent.

CS-6: Unremarkable.

C6-7: Unremarkable.

C7-Tl : Unremarkable.

Impression: Minimal discogenic degenerative changes C3-4. Central canal ventrally effaced with mere cord contact. No definite cord lesion or syrinx or edema.

On June 19, 2019, Mr. Brantley was sent out to be seen by Patrick G. Ryan, D.O., at Montgomery Neurosurgical Associates. Dr. Ryan is a Diplomat with the American Board of Neurological Surgery. Dr. [Ryan's] report of the visitation with Mr. Brantley of June 19, 2019, states in part as follows:

Evaluation type: New patient initial consultation: Cervical spine problem.

Chief complaint: Weakness. Patient states that they have had this problem before and they have not been hospitalized. Neck and shoulder pain. Right arm pain. Neck pain 8/10. Bilateral arm numbness. Bilateral leg numbness. Back pain 7/10. Neck and arm pain. Low back and buttock pain. Dizziness and/or light headedness.

Source of information: The history was obtained directly from the patient.

History of present illness: The patient is a -- year old black male.  He is referred to us for evaluation of the cervical and lumbar spine. He is an inmate at Elmore County Prison. In

7

February 2018 he was involved in an incident in which he was handcuffed behind his back. His hands were pulled behind his back, and his neck was hyperextended in a neck hold. He was taken down to the ground in this position. Since that time, he states that he has had neck and back pain. His neck pain is in his posterior neck and radiates into his left posterior trapezius region. This worsens with activity and prolonged standing. Rest helps this somewhat. He has intermittent numbness in his left arm in the ulnar region, especially if he crosses his arms. He states that both of his arms go numb if he crosses them. He also has pain in his midline lumbar spine in the L4-S1 region. This is painful in his left SI region rarely. This pain is non-radiating. Prolonged standing and activity worsen his pain. He has intermittent numbness in his right lower extremity/foot. When he crosses his legs, both legs go numb. He has had a cervical and lumbar MRI, after which he was referred here for further evaluation.

***

Musculoskeletal:
Lumbar exam.
Tenderness to palpitation at the following levels: No tenderness to palpitation midline and spine. SLR: Negative bilateral and sciatic nerve stretch test is negative bilateral. The patient has no lumber paraspinous muscle spasm.
The patient has no pain with AROM.
Cervical spine exam:  The patient complains of no tenderness. The patient has no cervical paraspinous muscle spasm.
Cervical range-of-motion
No pain with AROM noted.
Diagnosis: Cervical radiculopathy. Radiculopathy, lumbar region.
Follow-up visit: the patient was not scheduled for a specific follow-up appointment but will be scheduled in the future on an "as needed" basis.

Subsequently, Mr. Brantley underwent three sessions of physical therapy for neck and low back pain. The final physical therapy appointment was on October 23, 2019. The physical therapist, after Mr. Brantley's third appointment set forth as follows:

Assessment: Patient has had a very positive response to PT intervention. Now reports his neck and back pain are 90%

improved due to therapy treatment. He also has RC tendonitis
in the left shoulder and last Rx per Dr. Borowicz he was
introduced to rotator cuff rehab program. This RC program
was expanded today and he also did well with it.

Plan: Patient has regained full cervical neck and thoracic
lumbar back flexibility. He has met all PT goals and completed
3 of 3 approved PT sessions. He is now discharged with
extensive HEP as described above. He did very well as he was
very pleasant and motivated individual to work with.

Mr. Brantley has been seen on multiple occasions since the altercation
with the officers on February 18, 2018. Mr. Brantley has had x-rays and
MRIs, all of which showed minimal issues with the exception of possible
naturally occurring degenerative changes. Mr. Brantley has further been sent
out and seen by an outside neurosurgical expert who did not recommend any
further treatment, objective tests, surgery or follow-up. Thereafter, Mr.
Brantley had three sessions of physical therapy which were successful.

Mr. Brantley has already been seen by a neurosurgeon and there is no
medical reason for Mr. Brantley to again be seen by an off-site neurologist.

Mr. Brantley's necessary medical needs have never been denied or
delayed at any time.

In my opinion as a medical doctor, based upon my education, training
and experience, Mr. Brantley has at all times received medical treatment
within the standard of care of physicians practicing medicine in the state of
Alabama.

Doc. 126-1 at 3–9 (asterisks in original).

In a supplemental declaration, Dr. Borowicz avers that:

I, along with the other medical providers including certified registered
nurse practitioners and physician assistants, are solely responsible for
providing medical care and treatment to inmates/patients, including the
prescription of medications. None of the named defendants listed above, have
had anything to do  with the medical  treatment, including medications
prescribed by any off-site neurologist with regard to the necessary treatment of
inmate/patient Lerome Brantley.

Any and all medical treatment that Mr. Brantley has received while an

inmate with the Alabama Department of Corrections at the Staton/Elmore Correctional Facilities come through me as the Medical Director, or the other medical providers at Staton/Elmore.

Therefore, the named correctional defendants could not have retaliated against Mr. Brantley with regard to the alleged denial of his medical treatment, including prescribed medications[,] due to the fact that the named defendants are not responsible in any form or fashion for the necessary medical treatment of Mr. Brantley including prescription of medications.

Doc. 141-1 at 2.

Finally, in a subsequent declaration, Dr. Borowicz advises that Brantley's off-site neurologist prescribed Neurontin for pain relief and prison medical personnel deemed it appropriate to substitute Duloxetine, marketed under the brand name Cymbalta, for the prescribed Neurontin because "Neurontin and Cymbalta are similar and comparable medications used to combat neuropathic pain and chronic musculoskeletal pain." Doc. 145-1 at 2. The medication administration record shows Brantley received Duloxetine as prescribed by his providers and was allowed to keep Ibuprofen on his person. Doc. 145-2 at 6–7. Dr. Borowicz therefore maintains Brantley "receiv[ed] medications in line with that prescribed by Dr. Ryan, the outside neurologist." Doc. 145-1 at 2.

With respect to alleged retaliation regarding medical treatment and parole, Warden Headley avers that correctional officials "do not make medical decisions, we rely on the medical staff to make all medical decisions, we do not direct which medicines should be given and should not be given. Inmate Brantley has not been denied the treatment, including medication, prescribed by an off-site neurologist." Doc. 129-1 at 1. As to protests allegedly lodged by the defendants to Brantley's release on parole, Headley states

that "[a]ny protest regarding any inmate's release on parole, including Mr. Brantley, is not done out of retaliation, but rather due to concerns of public safety if released on parole. Retaliation is never a factor in any protest."  Doc. 129-1 at 2.

## C. Deliberate Indifference

Brantley contends the defendants have acted with deliberate indifference by a continued denial of adequate medical treatment for injuries suffered in the altercation with correctional officers on February 18, 2018.  Doc. 119 at 3–4.  The defendants adamantly deny this allegation.

A prison official has a duty under the Eighth Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32.  A prison official may therefore be held liable under the Eighth Amendment for acting with "'deliberate indifference'" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. at 828.  To demonstrate an Eighth Amendment violation regarding conditions, a prisoner must satisfy both an objective and a subjective inquiry.  *Farmer*, 511 U.S. at 834; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (holding that the law requires establishment of both objective and subjective elements to demonstrate an Eighth Amendment violation).  With respect to the

requisite objective element, an inmate must first show "an objectively substantial risk of serious harm . . . exists.  Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028–29 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  As to the subjective element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837–38; *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838).

> In sum,
>
> [u]nder the objective component, the plaintiff must demonstrate "a substantial risk of serious harm." [*Farmer*, 511 at 834]. . . . Under the subjective component, the plaintiff must prove "the defendants' deliberate indifference" to that risk of harm by making three sub-showings: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Lane* [*v. Philbin*, 835 F.3d 1302, 1308 (11th Cir. 2016)], (quotation omitted). . . . The [relevant] inquiry . . . [is] whether the defendants "disregard[ed]" the risk "by conduct that is more than mere negligence," *id.* (quotation omitted)—or more simply stated, whether they "recklessly disregard[ed] that risk," *Farmer,* 511 U.S. at 836, 114 S.Ct. 1970.

*Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020); *King v. Fairman*, 997 F.2d 259, 261 (7th Cir. 1993) (internal quotations and citations omitted) ("To sustain his constitutional claim, the inmate must demonstrate something approaching a total unconcern for his welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm.").

The Eleventh Circuit,

> (echoing the Supreme Court) ha[s] been at pains to emphasize that "the deliberate indifference standard ... is far more onerous than normal tort-based standards of conduct sounding in negligence," *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013), and is in fact akin to "subjective recklessness as used in the criminal law," *Farmer*, 511 U.S. at 839–40, 114 S.Ct. 1970; *see also id.* at 835, 114 S.Ct. 1970 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). Were we to accept the district court's determination that resulting harm, the failure to take impossible measures, or even the combination of both suffices to show a criminally (and thus constitutionally) reckless mental state, "the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not." *Goodman*, 718 F.3d at 1334.

*Swain*, 961 F.3d at 1288.

The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . .  It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  "The requisite mental state for prison officials is intent, or its functional equivalent, described as deliberate indifference[.]"  *King*, 997 F.2d at 261 (internal quotations and citations omitted).  "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.'"  *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Marsh*, 268 F.3d at 1028); *Lane*, 835 F.3d at 1307 (11th Cir. 2016) (holding that the Eighth Amendment is violated only when a correctional official "is

deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury."). The Eleventh Circuit has consistently held that "'[i]n order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the [mere] tort to a constitutional stature.'" *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982) (quoting *Wright v. El Paso County Jail*, 642 F.2d 134, 136 (5th Cir. 1981), *cert. denied*, 464 U.S. 932 (1983); *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) (same).

> As applied in the prison context, the deliberate-indifference standard sets an appropriately high bar. A plaintiff must prove that the defendant acted with "a sufficiently culpable state of mind." [*Farmer*, 511 U.S.] at 834, 114 S.Ct. 1970 (quotation omitted). Ordinary malpractice or simple negligence won't do; instead, the plaintiff must show "subjective recklessness as used in the criminal law." *Id.* at 839–40, 114 S.Ct. 1970. Indeed, even where "prison officials ... actually knew of a substantial risk to inmate health or safety," they may nonetheless "be found free from liability if they responded reasonably to the risk"—and, importantly for present purposes, "even if the harm ultimately was not averted." *Id.* at 844, 114 S.Ct. 1970. This is so because "[a] prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* at 844–45, 114 S.Ct. 1970 (quotations and internal citations omitted); *see also Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) ("It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates...." (quotation omitted)).

*Swain*, 961 F.3d at 1285–86.

Under the circumstances of this case, the court finds no deliberate indifference on the part of the defendants with respect to the medical treatment provided to Brantley. Specifically, Brantley received treatment for his injuries from both prison medical

personnel and an off-site neurologist, and there is nothing before the court which establishes "that the  defendants acted with a deliberately indifferent mental state, equivalent to 'subjective recklessness as used in the criminal law.' *Farmer*, 511 U.S. at 839–40, 114 S.Ct. 1970." *Swain*, 961 F.3d at 1288.

## D. Retaliation

In his motion for preliminary injunction, Brantley alleges a denial of medical treatment in retaliation for filing this case and also states he "believes" one or more of the defendants must have protested his parole due to this lawsuit as there had not been any protests to his parole prior to filing this case.  Doc. 119 at 4.  The defendants deny taking any action against Brantley for his litigating the instant cause of action.

Federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807 (1974)].  As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.' *Id*., at 404-405, 94 S.Ct., at 1807. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987).  "The first amendment prohibits state officials from retaliating against prisoners for exercising their right of free speech.  *See, e.g., Wright v. Newsome*, [795 F.2d 964, 968 (11th Cir. 1986)]. . . .  The gist of a retaliation claim is that a prisoner is penalized for exercising a right of free speech." *Thomas v. Evans*, 880 F.2d 1235, 1241–42 (11th Cir. 1989); *Farrow*

*v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003). The situation is clearly complicated when the alleged act of retaliation regards the provision of medical treatment as an inmate may attempt to inappropriately influence decisions regarding such treatment "by drawing the shield of retaliation around them." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied* sub nom *Palermo v. Woods*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996).

It is essential that federal courts "carefully scrutinize retaliation claims" brought by prisoners challenging the constitutionality of actions of correctional personnel. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied* sub nom *Palermo v. Woods*, 516 U.S. 1084 (1996). "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983). This is [necessary because prisoners'] . . . claims of retaliation are . . . easily fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation— can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2nd Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

With respect to a claim of retaliation, an "inmate must establish . . . three elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [defendants'] allegedly retaliatory conduct would likely deter a person of ordinary

firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech.  *See Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)."  *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999).  As to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his exercise of a right protected under the First Amendment and, but for the retaliatory motive, the adverse act complained of would not have occurred.  *Woods*, 60 F.3d at 1166; *Smith*, 532 F.3d at 1278.

An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by showing "that his conduct was constitutionally protected and that this conduct . . . was a 'motivating factor'" behind the challenged action of the defendants. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287(1977).  Merely alleging the ultimate fact of retaliation, however, is insufficient.  *Cain v. Lane*, 857 F.2d 1139, 1142, n.6 (7th Cir. 1988); *Woods*, 60 F.3d at 1166.  Additionally, conclusory allegations are insufficient to demonstrate the existence of each element requisite to establishing retaliation.  *Morales*, 278 F.3d at 131; *Bennett v. Goord*, 343 F.3d 133, 137 (2nd Cir. 2003) (Because prisoner retaliation claims are prone to abuse, "we are careful to require non-conclusory allegations.").  If an inmate meets his burden with appropriate evidence, the burden of production shifts to the defendants to show that they "would have reached the same decision as to [their action against the plaintiff] even in the absence of the protected conduct."  *Mt. Healthy*, 429 U.S. at 287.  "Under the *Mt. Healthy* approach, if

the government official 'can prove that [he] would have taken the adverse action in the absence of the plaintiff's protected conduct, [he] cannot be held liable.' *Thaddeus-X*, 175 F.3d at 388 n.4." *Smith*, 532 F.3d at 1278 n.22.

Brantley merely makes conclusory allegations of retaliation against the defendants regarding the medical treatment provided to him and protests submitted to his release on parole. He presents no evidence to support his claims against any named defendant. Moreover, even if the pleading standard had been met, Brantley fails to demonstrate that he, in fact, suffered an adverse action which "would likely deter a [prisoner] of ordinary firmness" from filing legal actions challenging the constitutionality of that action. *Smith*, 532 F.3d at 1277. There is nothing before this court which indicates that the defendants in any way impacted the treatment decisions of medical personnel or lodged improper protests to Brantley's release on parole. Moreover, it does not appear to the undersigned that the challenged action would deter an ordinary inmate from filing lawsuits and, in the experience of this court, the opposite is true as inmates routinely file complaints addressing the validity of medical treatment provided to them and adverse parole decisions. For instance, the records of this court establish that Brantley was not in any way deterred in this pursuit. Finally, Brantley likewise fails to satisfy the third requisite element of a retaliation claim, a causal connection between his constitutionally protected activity and any adverse action of the defendants regarding the medical treatment provided to him or the denial of his parole.

**D. Preliminary Injunctive Relief**

In this case, Brantley has failed to show deliberate indifference by the defendants to his need for continued medical treatment and has likewise failed to show any retaliatory act by the defendants regarding such treatment or his parole.  Thus, as to the first prerequisite for issuance of preliminary injunctive relief, the court finds that Brantley has failed to show a substantial likelihood of success on the merits, and his motion for preliminary injunction is due to denied for this reason alone.  Nevertheless, the court also finds that Brantley has not met his burden of establishing a substantial threat that he will suffer the requisite irreparable injury absent issuance of the requested preliminary injunction nor that the balance of potential harm weighs in his favor.  On this latter element, the court discerns that the potential for harm weighs more heavily in favor of the defendants as issuance of the injunction would have an unduly adverse effect on the ability of medical personnel to exercise their professional judgment in determining the appropriate manner in which to provide medical treatment to inmates and would inappropriately shift the authority to make such treatment decisions to inmates who are completely devoid of medical training.  Finally, the public interest element of the equation is, at best, a neutral factor at this juncture.  Brantley has therefore failed to meet his burden of demonstrating the existence of each element necessary to warrant issuance of preliminary injunctive relief.

## III.  CONCLUSION

A preliminary injunction is "not to be granted unless the movant clearly establish[es] the burden of persuasion as to all four elements."  *CBS Broadcasting v.*

*Echostar Communications Corp.*, 265 F.3d 1193, 1200 (11th Cir. 2001) (internal quotations omitted). Brantley has failed to carry his burden of persuasion on the four requisite elements as is required to establish entitlement to preliminary injunctive relief.

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motion for preliminary injunction filed by the plaintiff be DENIED.

2. This case be referred back to the undersigned Magistrate Judge for further appropriate proceedings.

On or before **November 16, 2020**, the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions contained in the Recommendation to which his objection is made. Frivolous, conclusive, or general objections will not be considered by the court.

Failure to file written objections to the proposed factual findings and legal conclusions set forth in the Recommendations of the Magistrate Judge shall bar a party from a *de novo* determination by the District Court of these factual findings and legal conclusions and shall "waive the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) ("When the magistrate provides such notice and a party still fails to object to the findings of fact [and law] and those findings are adopted by the district court the party may not challenge them on appeal

in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794

(11th Cir. 1989).

     DONE this 30th day of October, 2020.


                    <u>/s/ Jerusha T. Adams</u>
                    JERUSHA T. ADAMS
                    UNITED STATES MAGISTRATE JUDGE